# In the United States Court of Federal Claims

No. 03-2684L & No. 01-568L

(Filed: January 28, 2013)

| | | |
|---|---|---|
| ****************************** | ) | Indian monetary claims by lineal descendants |
| | ) | of loyal Mdewakanton based upon the Sioux |
| **SHELDON PETERS WOLFCHILD,** | ) | treaties of August 5, 1851 and June 19, 1858, |
| ***et al.,*** | ) | the Acts of February 16, 1863 and March 3, |
| | ) | 1863, and the Appropriation Acts for the |
| **Plaintiffs,** | ) | Department of the Interior in 1888, 1889, and |
| | ) | 1890; post-judgment motions; applicability of |
| **v.** | ) | the Indian Tribal Judgment Funds Use or |
| | ) | Distribution Act, 25 U.S.C. §§ 1401-08; |
| **UNITED STATES,** | ) | formulation of a distribution plan |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| ****************************** | | |

Erick G. Kaardal, Mohrman & Kaardal, P.A., Minneapolis, MN, for Wolfchild plaintiffs. With him on the briefs was William F. Mohrman, Mohrman & Kaardal, P.A., Minneapolis, MN.

Jody H. Schwarz, Trial Attorney, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Ignacia S. Moreno, Assistant Attorney General, and Stephen Finn and Daniel G. Steele, Trial Attorneys, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C. Of counsel were Gladys Cojocari, James Stroud, and Michael Bianco, Department of the Interior, Washington, D.C.

Jack E. Pierce, Pierce Law Firm, PA, Minneapolis, MN, for the Cermak plaintiffs and for the Stephens, R. Cermak, J. Cermak, Henderson, Klingberg, Alkire, Arnold, and Godoy groups of intervening plaintiffs.

Kelly H. Stricherz, Vermillion, SD, for the Mozak group of intervening plaintiffs.

Garrett J. Horn, Horn Law Office, Yankton, SD, for the Saul, Trudell, Taylor, Ferris, Henry, and Vassar groups of intervening plaintiffs.

Creighton A. Thurman, Yankton, SD, for the Cournoyer, Robinette, Kimbell, French, and Wanna groups of intervening plaintiffs.

Elizabeth T. Walker, Walker Associates, Alexandria, VA, for the anonymous Walker, the Enyard, and the Kitto groups of intervening plaintiffs.

Robin L. Zephier, Abourezk & Zephier, PC, Rapid City, SD, for the Zephier group of intervening plaintiffs.

Larry Leventhal, St. Paul, MN, for the Burley group of intervening plaintiffs.

Wood R. Foster, Jr., Siegel, Brill, Greupner, Duffy & Foster, PA, Minneapolis, MN, for the Lafferty, Blaeser, Whipple, and Lowe groups of intervening plaintiffs.

Bernard J. Rooney, Amherst, WI, for the Rooney group of intervening plaintiffs.

Scott A. Johnson and Todd M. Johnson, Johnson Law Group, Minnetonka, MN, for the Rocque group of intervening plaintiffs and the Descendants of Joseph Coursolle group of intervening plaintiffs.

Barry P. Hogan, Renaud Cook Drury Mesaros, PA, Phoenix, AZ, for the anonymous Blair group of intervening plaintiffs.

Gary J. Montana, Montana & Associates, Osseo, WI, for the Julia DuMarce group of intervening plaintiffs.

Jay C. Shultz, Lynn, Jackson, Shultz & Lebrun, PC, Rapid City, SD, for the Garreau group of intervening plaintiffs.

Douglas Kettering, Kettering Law Office, Yankton, SD, for the Ke Zephier group of intervening plaintiffs.

Randy V. Thompson, Nolan, MacGregor, Thompson & Leighton, St. Paul, MN, for the Abrahamson group of intervening plaintiffs.

Frances Felix, *pro se*, Minneapolis, MN, for herself and members of her immediate family as intervening plaintiffs.

Royce Deryl Edwards, Sr., Joplin, MO, for the Robertson-Vadnais group of intervening plaintiffs.

Rory King, Bantz, Gosch & Cremer, LLC, Aberdeen, SD, for the Marvel Jean DuMarce group and the Youngbear group of intervening plaintiffs.

Brian L. Radke, Radke Law Office, P.C., Sioux Falls, SD, for the Schroder group of intervening plaintiffs.

**OPINION AND ORDER**

LETTOW, Judge.

Although this case is pending on appeal before the Court of Appeals for the Federal Circuit, three post-judgment motions have been filed in this court.[1] Each of the three motions focuses on aspects of the Department of the Interior's resultant proceedings under the Indian Tribal Judgment Funds Use or Distribution Act ("Indian Judgment Distribution Act"), 25 U.S.C. §§ 1401-08, to effectuate the distribution of funds ordered by the court to be provided to the Indian claimants. *See Wolfchild v. United States*, 101 Fed. Cl. 54, 91-92 (2011) ("*Wolfchild VIII*"), *recons. denied*, 101 Fed. Cl. 92 (2011) ("*Wolfchild IX*"). First, the government has moved for a stay or, alternatively, an extension of time to prepare a distribution plan. *See* United States' Mot. for Stay or, in the Alt., Mot. for Relief from Judgment in the Form of an Extension of Time (Def.'s Mot."), ECF No. 1120. Second, the Wolfchild plaintiffs have objected to the initial actions by the Department of the Interior to implement the court's judgment and have moved for further judicial proceedings under the court's remand rule. *See* Wolfchild Pls.' Objection to Dep't's Oct. 1, 2012 Action on Remand and Mot. for Further Proceedings Under R[CFC] 52.2(f), as corrected ("Pls.' Cross-Mot."), ECF No. 1136. Third, plaintiff-intervenors have moved for an order compelling the Department of the Interior to implement the court's prior order that the government must provide reimbursement to plaintiffs and plaintiff-intervenors for their preparation and submission of genealogies in earlier phases of this case. *See* Pl.-Intervenors' Collective Resp. to Wolfchild Pls.' Objections to Dep't's . . . Oct. 1, 2012 Action on Remand and Mot. for Further Proceedings Under Rule 52.2(f) (Corrected), Cross-Mot. to Compel Def. to Provide Reimbursement to Pls. and Pl.-Intervenors for Preparation and Submission of Genealogies for Eligibility Pursuant to 28 U.S.C. [§] 1491(a)(2) and RCFC 52.2(a) ("Pl.-Intervenors' Cross-Mot."), ECF No. 1138 (referring to *Wolfchild VIII*, 101 Fed. Cl. at 86-89).

**BACKGROUND**

As this longstanding dispute evolved, more than 20,750 individual Indian claimants sought a monetary award under the Indian Tucker Act, 28 U.S.C. § 1505. The claimants comprise an "identifiable group of American Indians" within the meaning of that Act, specifically the lineal descendants of the "loyal Mdewakanton."[2] Their claims are premised

---

[1]The appeals and cross-appeals are pending before the Federal Circuit as Nos. 2012-5035, -5036, and -5043. Judgment was entered by this court under Rule 54(b) of the Rules of the Court of Federal Claims ("RCFC") on August 5, 2011. A motion for reconsideration was denied on October 25, 2011.

[2]The "loyal Mdewakanton" did not participate in the Sioux uprising in Minnesota in 1862, and instead acted affirmatively to save settlers. *See Wolfchild v. United States*, 96 Fed. Cl. 302, 313 (2010) ("*Wolfchild VII*"). As one of the consequences of their actions and loyalty, these Indians severed their tribal relations and many remained in Minnesota, where they suffered great deprivation and hardship. *Id*. The Sioux treaties of August 5, 1851 and June 19, 1858 were revoked generally as a result of the uprising, and thus the loyal Mdewakanton, along with those

upon the Sioux Treaties of August 5, 1851 and June 19, 1858, the Acts of February 16, 1863 and March 3, 1863, and the Appropriation Acts for the Department of the Interior in 1888, 1889, and 1890. *See Wolfchild VII*, 96 Fed. Cl. at 313-16.

The trust claims of the descendants of the loyal Mdewakanton ultimately proved to be unavailing, despite the use of explicit trust language by the Department of the Interior in handling the lands and resources purchased with the monies appropriated for their use (as well as the residual monies). *See Wolfchild v. United States*, 559 F.3d 1228 (Fed. Cir. 2009) ("*Wolfchild VI*"). Nonetheless, they did prevail on a restricted-use claim that was remanded by the court of appeals. *See Wolfchild VII*, 96 Fed. Cl. at 336-52. This court then ruled that the monetary judgment awarded to the loyal Mdewakanton, reflecting the amount of restricted funds held in trust accounts at the Treasury, was subject to the Indian Judgment Distribution Act, and noted particularly the responsibility of the Department of the Interior to develop a plan for making the requisite distribution and to identify the specific beneficiaries of the final judgment. *See Wolfchild VIII*, 101 Fed. Cl. at 86-88.

The Department of the Interior has undertaken proceedings to develop a plan and identify the qualifying beneficiaries. A notice published in the *Federal Register* on October 1, 2012, advised that the Department "[w]as developing a plan for distribution of judgment funds to the Loyal Mdewakantons" and set out proposed "criteria for eligibility to participate in any award." Department of the Interior, *Preliminary Plan for Distribution of Judgment Funds to the Loyal Mdewakantons*, 77 Fed. Reg. 59,963 (Oct. 1, 2012). Among other things, the Department scheduled hearings on the record in Sioux Falls, South Dakota, and Bloomington, Minnesota. *Id*., 77 Fed. Reg. at 59,964. Those proceedings are the subject of the pending motions.

## JURISDICTION

An appeal confers jurisdiction on the court of appeals and divests the trial court of jurisdiction. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (stating that after an appeal, the trial court surrenders "its control over those aspects of the case involved in the appeal"). Notwithstanding the pendency of an appeal, a motion for stay should first be filed in the trial court. *See* Fed. R. App. P. 8(a); *see also* RCFC 62(c) and (e). Accordingly, this court has juridical power to consider the government's motion for stay or, alternatively, for an extension of time to complete proceedings to develop a distribution plan. The court's authority to act on plaintiffs' cross-motion and the intervening plaintiffs' cross-motion is more

---

who participated in the uprising, were deprived of benefits under those treaties. Those who participated were resettled in western territories. The Act of Feb. 16, 1863, 12 Stat. 652, and the Act of Mar. 3, 1863, 12 Stat. 819, were adopted to provide relief and assistance in Minnesota to the loyal Mdewakanton. *Wolfchild VII*, 96 Fed. Cl. at 313-14. When those enactments and other subsequent statutes did not succeed in their purpose, Congress appropriated monies in the Appropriation Acts for the Department of the Interior for the years 1888, 1889, and 1890, to be used for the benefit of the loyal Mdewakanton and their families, specifying explicit directions for this usage. *See Wolfchild VII*, 96 Fed. Cl. at 316-17 (quoting Act of June 29, 1888, ch. 503, 25 Stat. 217, 228-29; Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992-93; Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349).

problematic, however, because those cross-motions touch on aspects of the case now being considered by the Department of the Interior and are also intertwined with the appeals, as will be discussed *infra*.

## ANALYSIS

### A. Stay

In acting on a stay application pending appeal, the court weighs the following four factors:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 512 (Fed. Cir. 1990) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

The four factors "contemplate individualized judgments," *Hilton*, 481 U.S. at 777, but the factors need not be given equal weight, *Standard Havens Prods.*, 897 F.2d at 512 (citing *Providence Journal Co. v. Federal Bureau of Investigation*, 595 F.2d 889, 890 (1st Cir. 1979)); *see also Acrow Corp. of Am. v. United States*, 97 Fed. Cl. 182, 184 (2011). "[T]he first two factors . . . are the most critical," and invariably the stay applicant must demonstrate "[m]ore than a mere 'possibility' of relief." *Beard v. United States*, 101 Fed. Cl. 100, 103 (2011) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009) (third alteration in original)).

The government argues that it has a strong likelihood of success on the merits, noting that the issues of law are complex and novel. Def.'s Mot. at 12. Assuredly, the legal issues "are fair ground[s] for litigation," as the government contends. *Id*. There also is little doubt that the historical facts attendant to the aftermath of the Sioux uprising provide context for the legal issues. In the years after their efforts to warn and protect settlers, the loyal Mdewakanton suffered significant detriments. The Sioux treaties of 1851 and 1858 were abrogated and no longer provided benefits for them. Additionally, because they had to sever their tribal relationships, they were not relocated westward, and were not living in the newly designated and allocated lands. Congress, through a series of enactments beginning in 1863, endeavored to relieve their destitution and provide a means for their livelihood, but it was not until the Appropriation Acts of 1888, 1889, and 1890 that effective aid was provided. The salient question on appeal will involve whether the assistance supplied by those Acts constituted "gratuitous appropriations" or were instead payments in lieu of treaty stipulations. *See Wolfchild VII*, 96 Fed. Cl. at 340 (quoting *Quick Bear v. Leupp*, 210 U.S. 50, 77 (1908)). There is no doubt that the Appropriation Acts provided funds for the Department of the Interior for the benefit of the loyal Mdewakanton, with specific restrictions on use, ensuring insofar as possible that the funds would provide a long-term resource. Then, for ninety years, the Department treated the funds, and assets purchased with the funds, as a trust corpus, and held any monies in trust

accounts. *See Wolfchild VII*, 96 Fed. Cl. at 319-21 (money held in Treasury trust accounts), 343-47 (assets and money restricted to and for use by the loyal Mdewakanton).

In these circumstances, although the legal questions are significant, novel, and difficult, the government has not shown that it is likely to succeed on the merits. To reiterate, although the government has manifestly demonstrated that the legal issues are "fair ground[s] for litigation," Def.'s Mot. at 12, no more than that is apparent.

To support a stay, the government also has the burden of showing that it will be irreparably harmed absent a stay. In this respect, the government cites the commitment of resources it has expended, and will expend, to proceed to develop a distribution plan. Def.'s Mot. at 21. The Department of the Interior has already taken substantial steps to formulate a plan, as the *Federal Register* notice issued on October 1, 2012, shows. That notice reflected considerable work by the Department in gathering and organizing historical materials, developing a proposed preliminary plan for distribution of funds, and scheduling public hearings. *See* 77 Fed. Reg. 59,963-67. Historically, in determining descendants who were qualified beneficiaries, the Department had used the so-called "1886 census" of the loyal Mdewakanton prepared by Special Agent Walter McLeod, with an addendum prepared by Special Agent Robert Henton dated January 2, 1889. *See Wolfchild v. United States*, 62 Fed. Cl. 521, 528 (2004) ("*Wolfchild I*"); *see also Wolfchild VI*, 559 F.3d at 1243 ("The Interior Department recognized, of course, that Congress intended the 1886 Mdewakantons to be the specific beneficiaries of the Appropriations Acts."). Notably, the proposed criteria in the *Federal Register* notice of October 2012 extend well beyond the 1886 census and 1889 addendum, also encompassing the 1917 McLaughlin Roll, the Birch Cooley Censuses, and the 1899 roll prepared by Inspector McLaughlin. *See* 77 Fed. Reg. at 59,967. In addition, the Department indicated that it was considering adding the 1862 Indian Camp Census, the Camp Release Census 1863, the Sibley Sioux Scout List—1863 Sibley Expedition, the 1866 Report of the Secretary of the Interior, the Payroll to Soldiers and Scouts 1891-92, and the 1891 Samuel Brown Scout List. *See id.* at 59,966. In short, the government has already expended considerable resources, and it will incur additional costs and expenses before it completes its task of formulating a distribution plan, but it is sufficiently far along its path that it would be a waste of resources to stop now. This factor weighs against a stay.

The latter two factors — injury to the other parties and the public interest — do not require extended discussion. The plaintiffs, intervening plaintiffs, and other potentially qualified beneficiaries have spent years pursuing their claims, which have now advanced to the point that resolution might be in view, albeit dimly and distantly. The public interest would also be served by continuing the Department's process. The one-hundred-fiftieth anniversary of the 1862 uprising has just passed, and that anniversary engendered renewed awareness of that event and President Lincoln's role in according justice to those involved.

In sum, for the reasons stated, the court declines to stay its judgment.

6

## B. Extension of Time

The court's judgment provided that "[i]n accord with 2[5] U.S.C. § 1402, the Secretary [of the Interior] shall complete preparation of [a] roll and [distribution] plan satisfying the criteria specified in 25 U.S.C. § 1403 within one year from the date of this decision and judgment." *Wolfchild VIII*, 101 Fed. Cl. at 92. That schedule has not been met. The Department advises "that it does not have the budget nor the personnel and resources to comply with the [c]ourt's deadline and effectuate its duties." Def.'s Mot. at 24. It asks for an indefinite extension of time to complete its work. *Id*. at 26-27.[3]

In entering judgment, the court recognized that the Department's task would not be an easy one. The deadline embodied in the judgment reflects the specific terms of Section 1402(a), which provide that "[w]ithin one year after appropriation of funds to pay a judgment of the . . . United States Court of Federal Claims to any Indian tribe, the Secretary of the Interior shall prepare and submit . . . a plan for the use and distribution of the funds." 25 U.S.C. § 1402(a). As a legal matter, the court looked to the circumstance that the judgment would be paid from the Judgment Fund in accord with 28 U.S.C. § 2517 and 31 U.S.C. § 1304(a)(3)(A), after certification by the Chief Judge of this court. *See* 28 U.S.C. § 2517(a) (providing for payment upon "presentation to the Secretary of the Treasury of a certification of the judgment by the clerk and chief judge of the court"); 31 U.S.C. § 1304(a) (providing a permanent appropriation, *i.e.*, the Judgment Fund, to pay judgments issued against the United States under specified laws, including 28 U.S.C. § 2517). The Department acknowledges the applicability of this legal regime for paying judgments entered by this court, *see* Def.'s Mot. at 26,[4] but it comments that

---

[3]The Department suggests that it provide a status report within ninety days after the grant of an extension, describing its progress to that point in developing a distribution plan, Def.'s Mot. at 27, and then provide status reports every ninety days thereafter.

[4]As the Court of Claims observed in *Temoak Band of Western Shoshone Indians, Nevada v. United States*, 593 F.2d 994 (Ct. Cl. 1979):

> [b]y recent enactments, Act of March 7, 1978, Pub. L. No. 95-240,
> 92 Stat. 107, 116 and Act of May 4, 1977, Pub. L. No. 95-26, 91 Stat.
> 61, 96, Congress has amended the old standing appropriation to pay
> Court of Claims judgments, 31 U.S.C. § 7254a, to make it available
> for Indian Claims Commission judgments, and to remove the old
> $100,000 limitation, there being now no upper limit on the amount of
> the judgment that can be paid.

*Id*. at 999. A codification of Title 31 of the United States Code in 1982 shifted what was 31 U.S.C. § 724a to then-new Section 1304. *See* 31 U.S.C.A. § 1304, Historical and Statutory Note. Additionally, the Indian Claims Commission was terminated on September 30, 1978, but this court's predecessors had jurisdiction over Indian claims accruing on and after August 13, 1946. *See Navajo Tribe v. United States*, 586 F.2d 192 (Ct. Cl. 1978) (en banc).

"[a] payment from the Judgment Fund can only be made when awards or settlements are final (*i.e.*, no further review or appeal will be sought)," *id*. at 26 (citing 31 U.S.C. § 1304). Additionally, the Department notes that "Congress can always modify the plan." *Id*.

The Department cites the *Western Shoshone* case as a prior instance in which a large "identifiable group of American Indians" received a judgment award. *See* Def.'s Mot. at 9 (presumably referring to the litigation that resulted in a number of reported decisions, including *Western Shoshone*, 593 F.2d 994 (describing the lengthy and convoluted history of the litigation)). Respecting that case, the Department advises that

> compilation of the Western Shoshone beneficiary roll encompassed: (1) receipt of over 9,600 applications; (2) review of genealogical materials; (3) the passage of nearly four years from the filing of applications to the first distribution (the final distribution has not yet been made); (4) review of approximately 859 appeals; (5) costs in excess of $2 million. The Bureau hired an outside contractor with specialized expertise to perform a significant amount of the work on that distribution roll.

*Id*. (citing Decl. of Michael Smith (Aug. 3, 2012) ("Smith Decl.") ¶ 16)).

The litigation and planning for a distribution in *Western Shoshone* were made difficult not only by the number and scattered nature of the individual claimants but also by the lack of cooperation by many of the Western Shoshone and their tribal organizations in developing a plan. *See Dann*, 470 U.S. at 42-43. By contrast, the loyal Mdewakanton have participated vigorously in all phases of this litigation, including the current efforts of the Department of the

---

The operative effect of the judgment entered in the *Western Shoshone* case was addressed by the Supreme Court in *United States v. Dann*, 470 U.S. 39 (1985), where the Court described what happened after the judgment was entered:

> On December 6, 1979, the Clerk of the Court of Claims certified the Commission's award to the General Accounting Office. Pursuant to 31 U.S.C. § 724a (1976 ed., Supp. V), this certification automatically appropriated the amount of the award and deposited it for the Tribe in an interest-bearing trust account in the Treasury of the United States.

> Under 25 U.S.C. § 1402(a) and § 1403(a), the Secretary of the Interior is required, after consulting with the Tribe, to submit to Congress within a specified period of time a plan for the distribution of the fund. In this case, the Secretary has yet to submit a plan of distribution of the $26 million owing to the refusal of the Western Shoshone to cooperate in devising the plan. The fund apparently has now grown to $43 million.

*Id*. at 42-43 (footnotes omitted).

Interior to formulate a plan. Nonetheless, because thousands of individual claimants are involved here, the Department understandably requires additional time to settle on a plan. As a consequence, the court grants an extension of time to the Department to develop a plan.[5]

The amount of additional time needed by the Department for this purpose is avowedly uncertain and indefinite at this juncture. The court acknowledges the Department's concern about completing its assigned task in a period of potentially limited budgetary resources. Nonetheless, the assignment has to be addressed. The court accordingly will require the Department to provide status reports every ninety days following this decision, for a period of one year, and then will entertain proposals for a firm deadline.

## C. Objections to the Department's Proposed Plan

The Wolfchild plaintiffs express dissatisfaction with the Department's proposed plan of distribution as published in the *Federal Register* and ask the court to intervene to recalibrate the eligibility criteria set out in the proposal. *See* Pls.' Cross-Mot. at 1-2. Plaintiffs suggest that the Department's proposed expansion of those eligible beyond the 1886 census and the 1889 addendum serves to "weaken[] or dilut[e] the concept of the 1886 Mdewakanton Group," *id*. at 3, and reflects pressure exerted by the Shakopee Mdewakanton Sioux Community, one of the three Indian communities formed in the areas of 1886 lands in Minnesota, *id*.[6] The Department responds that the Wolfchild plaintiffs' objections are premature and not ripe. United States' Opp'n to Wolfchild Pls.' Mot. For Further Proceedings ("Def.'s Opp'n to Pls.' Cross-Mot.) at 1, ECF No. 1137. The Department contends that the Wolfchild plaintiffs will have ample opportunities to object to the plan, both as proposed and once it is finally adopted. *Id*. at 1-2.

The court emphasized in its entry of judgment and referral to the Department to formulate a distribution plan that the Indian Judgment Distribution Act explicitly confers upon the Department the responsibility to develop a distribution plan and a roll of beneficiaries under the plan. *See Wolfchild VIII*, 101 Fed. Cl. 86-91. Insofar as the plan is concerned, this court's role is limited to review. Although the parties have not argued their positions in terms of "primary jurisdiction," this is an instance calling for application of that doctrine. Initial action respecting a distribution plan rests with an agency, *i.e.*, the Department, and the court should not intervene in the agency proceedings absent extraordinary circumstances. As the Supreme Court has explained:

---

[5]The Department emphasizes that a beneficiary roll is developed *after* a plan is formulated and approved. *See* Def.'s Mot., Smith Decl. ¶ 10. The court's prior decisions in the case, *see Wolfchild VIII*, 101 Fed. Cl. at 86-92; *Wolfchild IX*, 101 Fed. Cl. at 97-99, were concerned not only with preparation of a plan but also a roll of beneficiaries because the Department's litigation posture had, until the very end of this court's proceedings, focused so heavily on identifying specific qualifying plaintiffs through nineteenth-century census rolls and then genealogical proofs, *see Wolfchild VIII*, 101 Fed. Cl. at 87-88.

[6]The Wolfchild plaintiffs also call upon the court to require the Department to provide information regarding the sources of information used to develop the Department's proposed plan. *See* Pls.' Cross-Mot. at 12-13.

> [P]rimary jurisdiction . . . is a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency.  It requires the court to enable a "referral" to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling.  *See* [*United States v.*] *Western Pacific* [*R.R.*], 352 U.S. [59,] 63-64, 77 S.Ct. [161,] 164-65 [(1956)]; *Ricci v. Chicago Merchantile Exchange*, 409 U.S. 289, 291, 302, 93 S.Ct. 573, 574, 580, 34 L. Ed. 2d 525 (1973); *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 65, 68, 91 S.Ct.  203, 206, 208, 27 L. Ed. 2d 203 (1970).  Referral of the issue to the administrative agency does not deprive the court of jurisdiction; it has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice.  *See Carnation Co. v. Pacific Westbound Conference*. 383 U.S. 213, 222-223, 86 S.Ct. 781, 787, 15 L. Ed. 2d 709 (1966); *Mitchell Coal & Coke Co. v. Pennsylvania R. Co.*, 230 U.S. 247, 266-267, 33 S.Ct. 916, 924-925, 57 L. Ed. 1472 (1913); Jaffe, *Primary Jurisdiction*, 77 Harv. L. Rev. 1037, 1055 (1964).

*Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993) (footnote omitted).

The court sees no basis now on which it could interject itself into the Department's proceedings related to a distribution plan.  Accordingly, the Wolfchild plaintiffs' motion for further judicial action at this juncture is unavailing.

### D.  Reimbursement

The numerous plaintiff-intervenors seek a form of interim relief pending final disposition of this protracted dispute.  Specifically, they request reimbursement of "their costs in preparing and submitting to the court and the government, genealogies to establish their status as eligible claimants."  Pl.-Intervenors' Cross-Mot. at 12 (quoting *Wolfchild VIII*, 101 Fed. Cl. at 92).  The government resists this request on the ground that plaintiff-intervenors' request is premature, noting that "[t]he [c]ourt has already acknowledged and articulated that the issues of costs and attorneys' fees are remaining issues to be taken up after the Secretary [of the Interior] submits the distribution plan and report."  United States' Opp'n to Pl.-Intervenors' Cross-Mot. at 2.

Interim reimbursement, as well as payment of costs and fees, is not appropriate in a case of this nature.  The judgment is not yet final within the meaning of RCFC 54(d), because the appeals and cross-appeals remain pending before the Federal Circuit.  Additionally, costs and fees in Indian claims can be contentious and require in effect a second litigation.  *See*, *e.g.*, *Western Shoshone Identifiable Group, Temoak Bands of Western Shoshone Indians, Nevada v. United States*, 652 F.2d 41 (Ct. Cl. 1981).  Not infrequently in these cases, "counsel [will] have devoted extensive and effective efforts over a long period of time."  *Id*. at 46.  That circumstance

10

does not provide a basis for awarding interim reimbursement or fees.[7] Plaintiff-intervenors are not entitled to such interim reimbursement or costs and fees.

## CONCLUSION

For the reasons stated, defendant's request for a stay is DENIED, but its request for an extension of time is GRANTED. Defendant shall file a status report with the court within ninety days following this decision, and every ninety days thereafter, until one year has passed. At that time, the parties are requested to address the feasibility of establishing a final deadline for action by the Department of the Interior to complete a distribution plan. The Wolfchild plaintiffs' motion for further judicial proceedings at this juncture is DENIED, as is the plaintiff-intervenors' request for an order requiring the Department to provide interim reimbursement.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

[7]In *Western Shoshone*, 652 F.2d 41, the Court of Claims adopted the factors considered in *Cherokee Nation v. United States*, 355 F.2d 945, 953-54 (Ct. Cl. 1966), as a framework for determining a reasonable award of costs and fees. Those criteria are not directly applicable to the reimbursement request put forward by plaintiff-intervenors, but they would relate to costs and fees awardable at the successful conclusion of litigation. The timing of a reimbursement award would presumptively follow the same path as an award of costs and fees, however.